## Thomas Coates *v.* William R. Chapman, Appellant.

195   109
210   ²618

*Negligence—Notice as to danger.*

In an accident case, where the defendant alleges that the plaintiff had warning of the dangerous character of the place where he was injured, the nature of the warning and the knowledge of the person who gave it are proper for the consideration of the jury on the question of plaintiff's contributory negligence; and if a request for charge fails to state that the warning had reference to the place of injury, it is properly refused.

*Negligence—Pleading—Evidence—Variance.*

In an action to recover damages for personal injuries the statement alleged that the defendant negligently constructed a scaffold of insufficient strength to support the weight placed upon it. After this there was a more specific statement of the facts and circumstances of the injury, in which it was alleged that a board of insufficient strength, which was placed across an area way, broke. This was followed by an allegation that the scaffold was overloaded, and that in consequence thereof it broke. Without specifying any defect in the construction, it was averred that there was negligence in the use of the scaffold. *Held*, that the plaintiff could recover without proof that the board over the area way broke.

*Negligence—Fellow-servants—Independent contractor — Superintendent of building operation.*

Where a general superintendent of a building operation exercises no control over the independent contractors, except by calling their attention to the requirements of the contract, the fact that an independent contractor instructs his foreman to obey the orders of the superintendent, does not make his employees, and those of the owner, coemployees within the meaning of the rule respecting the negligence of fellow-servants.

*Evidence—Cross-examination—Negligence.*

In an accident case, a witness for plaintiff was asked on cross-examination whether he had not told a number of persons, some only of whom were named, that the plaintiff had told him the scaffold was unsafe. He answered, "No, sir; but they tried to get me to say that I said so." A witness for defendant to whom this question was read was asked: "Is that true or not?" *Held* (1) that as an independent evidence of an admission by the plaintiff, the testimony was incompetent; (2) that for the purpose of contradiction the question was bad in form, because it contained two inquiries, and a simple affirmative or negative answer to which a witness should be confined might refer to either, and the latter was entirely unimportant; (3) that it was bad in substance, (*a*) because the matter proposed to be contradicted was elicited by irrelevant cross-examination; (*b*) because the proper ground for contradiction had not been laid by calling the witness's attention to the time, place and circumstances.

Argued Jan. 15, 1900. Appeal, No. 166, Jan. T., 1899, by defendant, from judgment of C. P. No. 4, Phila. Co., June T., 1897, No. 1688, on verdict for plaintiff. Before GREEN, C. J., MITCHELL, DEAN, FELL, BROWN and MESTREZAT, JJ. Affirmed.

Trespass for personal injuries. Before AUDENRIED, J.

At the trial it appeared that in 1897, Thomas Henry started a building operation and employed the plaintiff as a carpenter on the work. William R. Chapman made a contract with Henry by which he undertook to do the brick work supplying the material as well as the labor. Plaintiff was injured by the fall of the scaffold which was alleged to have been overloaded with brick. The circumstances of the accident are stated in the charge of the court, infra.

When John B. Sellers was on the stand he was asked the question:

Mr. Page: "Q. I read to you as follows: 'You did not tell him (Jordan), or anybody else, or John Chapman, that Coates told you that the scaffold was not safe? A. No, sir; but they tried to get me to say that I said so.' Is that true or not?"

Objected to, it appearing that the plaintiff was not present. Objection sustained.

Mr. Page: My purpose is simply to contradict Mr. Biggard.

The Court: I do not think that is a material point. Exception noted for defendant. [8]

The court charged in part as follows:

On the morning of July 3, Coates went to work on a house known as No. 5512 Woodland avenue. At this time he was engaged in the construction of a bay window there, and about half past nine o'clock, as he was kneeling on a piece which runs across the bay window, somewhat lower than the cornice, finishing the cornice of the bay, he heard a noise, and immediately there crashed down upon him a scaffold, which had fallen over, loaded with a large quantity of brick. This scaffold and trestles which had supported it, falling over on Coates, pinned him fast across the cornice. The other workmen, hearing his cries, and knowing, of course, what happened, hurried to his assistance, freed him and carried him to the second floor. Thence

he was removed to a patrol wagon and taken to the Presbyterian hospital. After lying there nine hours, and being treated by the hospital physician, he was taken to his brother's house, and from there removed to his own house. His injuries have been described to you. His scalp was wounded, two bones of his right arm were broken, his left leg was bruised, and his back was bruised and sprained, the muscles being injured and the ligaments said to have been sprained. The scaffold whose fall occasioned his injuries had been erected by the employees of Mr. Chapman, that is, the bricklayers whom he had hired to do the work which he had contracted for with Thomas Henry. The particular work in which these men were engaged, and for the purpose of enabling them to finish which this scaffold had been constructed, was the carrying up of the party wall between Nos. 5512 and 5510 Woodland avenue. That, you will recall, had been built to the height of five feet above the third floor, and it being impossible for men standing on the footboard laid across the rafters to build any higher, the scaffold had been put up, some said by a colored man, who was called here as a witness, but according to the statement of Mr. Sellers, it had been constructed by him. It ran the length of the house from front to back, from forty-five to fifty feet long. It was supported on trestles, and these trestles rested at one end on the ledger board which had been laid on the third floor joist by the carpenter, for the purpose of keeping them in place, and at the other end on a twelve inch wide board one inch thick, which had been laid parallel to the ledger board, four and a half or five feet out from it toward the middle of the house, running across the joists just like the ledger board did. On these trestles were laid pieces of board laid in sixteen feet lengths. [These boards were said, and it is not disputed, to have been brought to that operation by Mr. Henry for the purpose of being used in roofing the houses. The bricklayers had helped themselves to the boards and used them in building the scaffolding.] [1] [Before the bricklayers arrived on the morning of the accident (and as I recollect the testimony, they got there about 9 o'clock), the defendant's hod carriers had, as the witnesses said, loaded the scaffold; that is, they had deposited on it such bricks as they thought were needed to start the bricklayers who were to work there, and keep them sup-

plied until the wall was finished.   I do not think that in regard to any of the facts which I have mentioned to you there is any dispute.   As I understand the testimony of the witnesses, what I have just gone over is pretty clear and well established.]  [2]   There is some dispute, however, as to just how the scaffold, or rather the trestles which supported it, were stayed in the center part of the building.   It is contended on behalf of the plaintiff that at the time of this accident, as well as at the time when this scaffold was erected, there was open in the center of the building, where the accident happened, a well hole, in which it was intended to build a stairway.   It was intended here, as I understood the evidence, to construct a square staircase in which the steps run transversely across the building ; and it was said by the plaintiff's witnesses, and they were all agreed on this point, that at the time the scaffold was constructed and at the time the accident happened, this well hole, which was open, was six feet ten inches across, measured with the length of the building.   They say that this well hole was spanned by the ledger board, laid originally by the carpenters, and on the other side by the one inch thick board which the bricklayers had laid there to support the trestle ; and the plaintiff's witnesses, all agreeing on this point, testified that there was a trestle placed over the well hole, supported, not by any rafters, of course, because there were no rafters there, but supported only by the ledger board 'and the one inch board which paralleled it.

Now the testimony of these witnesses is doubted by the defense, and an attempt has been made to contradict them.   [The theory of the defense is that this well hole, instead of being six feet ten inches wide, lengthwise with the building, was in fact only three feet six inches ; and instead of there being a trestle resting on these two boards at a point over the well hole, there was no trestle there.   The trestles that supported the scaffold, they have fixed at points on either side of the opening left for the staircase.   The testimony in support of that contention seems to be that of Mr. Sellers and Mr. Jordan.   But whoever they were, and there were several witnesses called by the defense on this point, their testimony was based on measurements made by them three or four days subsequent to the happening of the accident.   It may well be that their measurements were

correct, and they are doubtless telling you the truth when they come here and tell you that they found the well hole to be of such dimensions as they have described when they took the witness stand. And yet it does not necessarily follow from what they said that at the time of the accident, and at the time the scaffold was put up, the well hole was of that size; because it has been testified by other witnesses, one of whom I think was David Biggard, and the other Vernon Biggard, the carpenters, that as soon as the party wall had been completed, the carpenters, who got to work on the first working day—whether that was the 5th of July or 6th of July is immaterial—acting under orders from the superintendent of the buildings, put in certain joists or rafters so as to make the well hole smaller, for by that time it was said the positions of the staircase and the newel post about which the stairs were built were so accurately defined that that part of the third floor could be finished to that extent. I take it, gentlemen, that there is really no conflict of evidence on this point, although, as I say, the question of the exact size of this well hole has been called in dispute by the defense.] [3]

The question of what were the facts in regard to the construction of the scaffold is a question which you must determine. What were the facts? How was that scaffold built? Was it supported by trestles which at this point, in the center of the building, rested on this board only an inch thick, spanning space of almost seven feet? Or was it supported, as it was argued by counsel for the defense, by several trestles at this point standing on these strips or boards, which, however, instead of lacking support beneath them, rested at these places on several rafters? You will have to determine that question of fact. Having determined that, direct your attention to the question whether the construction which you shall find to have existed there was a negligent construction, whether it was a fair and workmanlike manner of building a scaffold. Determine whether a scaffold built in that way is constructed with that degree of care and attention which every man of prudence, sound judgment and common sense would exhibit for the safety of others, that the law requires, to that every man is bound to in performing every act in life. Then consider whether, in view of such construction as you may find to have really existed

there, it was a reasonable and prudent thing for the defendant to have permitted his employees to load the scaffold to the degree to which it was loaded; was there more of a load; were there more bricks deposited on this scaffold than a reasonable, prudent man, careful of the safety of those around him, would have deposited there or permitted to be deposited or left there by those under his control and in his employ? If the construction was faulty in that it failed to comply with those requirements which prudence and common sense would have exacted from one building such a scaffold under the circumstances existing there, then there was negligence on the part of the defendant. If there was a heavier load deposited on that scaffold than a reasonable, prudent person, under the circumstances would have considered safe to put there, taking into consideration his duty to see that no harm came from his acts to other people, that is, that he was not doing that which there was reason to expect would result in their harm, then there was negligence on the part of the defendant. Of course, as I have told you on other occasions, no man is bound to answer for negligence in the abstract. I may be just as careless as I please, as neglectful of my duties toward others as I please, but if my negligence and carelessness does not result in any harm, no one can recover damages from me. It is for the consequences of his negligence that a man answers, not for the mere fact that he has not done what a reasonable, sensible man would have done in his position. So that even if you find there was negligence in respect to the particulars I have pointed out to you, you would have no right to give a verdict here to this plaintiff, and against the defendant, unless you believe that such negligence as you find to have existed, if you discover there was negligence here, actually resulted in the injuries that the plaintiff complains of. One of the questions, therefore, for you to determine is, was the fall of that scaffold due, as alleged by the plaintiff, to the breaking of the insufficient board which it is said the defendant used in the construction of it? Was it brought about by the loading of the scaffold with a weight of bricks too great to be supported by the trestle resting on the one inch board? If there was negligence in these particulars, if the fall of the scaffold was brought about by such negligence, and the fall of the scaffold, without any contribution to these consequences from

the negligence or carelessness of the plaintiff, hurt and injured the plaintiff in the way he has testified, then the plaintiff is entitled to a verdict, and under no other circumstances.

Verdict and judgment for plaintiff for $3,000. Defendant appealed.

*Errors assigned* were (1–7) above instructions, quoting them; (8) rulings on evidence, quoting the bill of exceptions.

*S. Davis Page*, of *Page, Allinson & Penrose*, for appellant.— There was a fatal variance between the statement and its proof: Good v. Mylin, 8 Pa. 51; Braunschweiger v. Waits, 179 Pa. 49.

The accident was caused by the negligence of a fellow-servant: Rourke v. White Moss Colliery Co., L. R. 2 C. P. Div. 205; Powell v. Construction Co., 88 Tenn. 692; Miller v. Ry. Co., 38 Am. & Eng. R. R. Cas. 234; Central R. Co. v. O'Hara, 46 Ga. 417. The credit of a witness may be impeached by proof that he has made statements out of court, contrary to what he has testified at the trial, but it is only such matters as are relevant to the issue that the witness can be contradicted upon: 1 Greenleaf on Evidence (Lewis's ed.), sec. 462; Stephens's Digest of the Law of Evidence, art. 131, p. 229.

The form of the question referred to in the eighth assignment was unobjectionable: Farmers' Mut. Fire Ins. Co. v. Bair, 87 Pa. 124.

*John J. White*, for appellee.—There was no variance between the statement and proof: Shears v. Wood, 7 Moore's Rep. 345.

Servants of different masters, although employed on the same work, are not fellow-servants within the rule: Svenson v. Atlantic, etc., Steamship Co., 57 N. Y. 108; Catawissa R. R. Co. v. Armstrong, 49 Pa. 189; P. W. & B. R. R. Co. v. State, 58 Md. 372; Vose v. Lancashire, etc., R. R. Co., 2 H. & N. 72; Warburton Great Western Ry. Co., L. R. 2 Exch. 30; Swainson v. Great North Eastern Ry. Co., L. R. 3 Exch. Div. 341; Hunt v. R. R. Co., 51 Pa. 475.

Servants of subcontractors are not fellow-servants with the contractor's employees: Murphey v. Caralli, 3 H. & C. 462; Murray v. Currie, L. R. 6 C. P. 24; Curley v. Harris, 11 Allen,

112; Young v. R. R. Co., 30 Barb. (N. Y.) 229; Hass v. Phila. & Southern S. S. Co., 88 Pa. 269; Hunt v. R. R. Co., 51 Pa. 475; Smith v. N. Y. & Harlem R. R. Co., 19 N. Y. 127; Giese v. Hall, 37 Hun, 440.

Employees who are at work in the construction of a building, if servants of different masters, are not coemployees within the rule respecting the negligence of fellow-servants: Reilly v. Atlas Iron Co., 83 Hun, 196; Murray v. Usher, 117 N. Y. 542; Johnson v. Netherlands American Steam Co., 132 N. Y. 576; Post v. Stockwell, 44·Hun, 28; Osborne v. Morgan, 130 Mass. 102; Hunt v. Penna. R. Co., 51 Pa. 475.

It is submitted it is not material to this case what Biggard told John Chapman or Sellers in plaintiff's absence: Smith v. Price, 8 Watts, 447; Stearns v. Merchants' Bank, 53 Pa. 490.

OPINION BY MR. JUSTICE FELL, March 12, 1900:

The fifth, sixth, seventh and eighth assignments are the only ones that need be noticed. Of the fifth it is sufficient to say that there was testimony tending to show that the plaintiff was not injured while working under the scaffold which fell. If he had been under it a recovery would not necessarily be barred by the fact that he had been warned that it was dangerous. The nature of the warning and the knowledge of the person who gave it would have been proper for the consideration of the jury on the question of his negligence. As the request for charge fails to state that the warning had reference to the place of injury, it was properly refused.

The sixth assignment relates to an alleged variance between the allegations of negligence and the proofs. The plaintiff did not confine himself to a single allegation of negligence. The general allegation is that the defendant negligently constructed a scaffold of insufficient strength to support the weight placed upon it. This is followed by a more specific statement of the facts and circumstances of the injury, in which it is alleged that a board of insufficient strength, which was placed across an area way, broke. Then follows an allegation that the scaffold was overloaded, and that in consequence thereof it broke. Without specifying any defect in construction, it is averred that there was negligence in the use of the scaffold. Under this averment

the plaintiff could recover without proof that the board over the area way broke.

The contention on which the seventh assignment is based, that the negligence, if any, was that of a fellow-workman, cannot be sustained. The plaintiff, a carpenter, was employed by the owner and builder of a row of houses to construct the bay windows. The defendant was an independent contractor for the brick work, who furnished the materials and laid the bricks at a fixed price per 1,000. There was a general superintendent of the whole work employed by the owner to see that the various contracts were complied with. He exercised no control over the defendant or his workmen, except by calling their attention to the requirements of the contract. He gave no directions as to the manner in which the work should be done. The fact that the defendant instructed his foreman to obey the directions of this superintendent did not make his employees and those of the owner coemployees within the meaning of the rule respecting the negligence of fellow-servants: Hunt v. R. R. Co., 51 Pa. 475.

The eighth assignment relates to the exclusion of testimony. A witness for the plaintiff was asked in cross-examination whether he had not told a number of persons, some only of whom were named, that the plaintiff had told him the scaffold was unsafe. He answered: "No, sir. But they tried to get me to say that I said so." A witness for the defendant, to whom this question was read, was asked: "Is that true or not?" An objection to this question was sustained. As independent evidence of an admission by the plaintiff this testimony was of course incompetent, and its admission for any purpose was to be carefully guarded, as it would mislead the jury if they failed to discriminate between proof that a witness had said to someone that an admission had been made to him and proof that an admission had in fact been made by the plaintiff. For the purpose of contradiction this question was bad in form, because it contained two inquiries, and a simple affirmative or negative answer to which a witness should be confined, might refer to either, and the latter was entirely unimportant. It was bad in substance (1) as the matter proposed to be contradicted was elicited by irrelevant cross-examination; (2) as the proper ground for contradiction had not been laid by calling the witness's

attention to the time, place and circumstances. The case was necessarily for the jury, and we see no error in its submission or in the rulings of the court.

The judgment is affirmed.